[Cite as *State v. Celaya*, 2019-Ohio-2747.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28177 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-1295 |
| | : | |
| ANTHONY CELAYA | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of July, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, P.O. Box 574, Dayton, Ohio 45409
      Attorney for Defendant-Appellee

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Pursuant to R.C. 2945.67(A) and Crim.R. 12(K), the State of Ohio appeals from a judgment of the Montgomery County Court of Common Pleas, which granted Anthony Celaya's motion to suppress. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} The evidence at the suppression hearing established the following facts.

{¶ 3} At approximately 1:30 a.m. on April 2, 2018, Dayton Police Officer Stephen Quigney was sitting in his cruiser in a residential area, talking to another officer (Officer Halley), who was seated in another cruiser. At that point, Quigney saw an individual crossing the street with a large object. It was cold and snowy, and the object was wrapped in plastic. Quigney was trying to figure out if the individual (Celaya) had just stolen something. Celaya went into an alley behind homes. Both cruisers pulled into in the alley and both officers (Quigney and Halley) got out. They saw Celaya digging into a trash can.

{¶ 4} Quigney exited his cruiser, approached Celaya, and asked, "What's up man? What are we doing tonight?" Celaya responded that he was "scrapping." When this encounter occurred, Celaya was standing with a large trash can mostly, if not entirely, behind him and to his left; a fence and garage were also behind him. There were garages and fencing down the sides of the alley, and fencing was directly opposite Celaya, on the other side of the alley. The entrance to the alley to Celaya's right was blocked by the two police cars, and the left end of the alley (through which Celaya might have exited) was open. Both officers were standing next to Celaya, one in front, and one

to his right (the side nearest the police cruisers). Quigney and Halley were in the uniform of the day and were armed. The trial court found that Celaya was blocked in on all sides by the police, a trash can, and a garage wall.

{¶ 5} When Quigney was standing about four feet from Celaya, he said, "Got anything on you, bud? You know, a lot of scrappers got knives on them, you got any knives?" Celaya responded that he had a couple of knives. Quigney then asked, "Do you mind if I get them while I'm talking to you?" Celaya did not specifically give consent at this point, but pointed to his right front pants pocket and said he was pretty sure they were in there.

{¶ 6} Officer Quigney again asked if Celaya would mind if he got the knives out, and Celaya said, "Go ahead." *See* State's Ex. 1. Quigney searched Celaya's right front pants pocket. Quigney testified that he "reached in and pulled out" a small Tupperware container; he stated that the Tupperware was the first item that he encountered and that he needed to remove the Tupperware to search the pocket for knives. Quigney further testified that he further searched the pocket and found a knife.

{¶ 7} However, the cruiser video reflects that Quigney took one item out and placed it in his own pocket. Quigney then looked through Celaya's right jacket pocket, taking items out, looking at them, and reinserting them into the coat pocket. While searching at this point, Quigney also asked Celaya if he had anything in his backpack. There was no response that is material.

{¶ 8} The video showed that Officer Quigney returned to Celaya's right front pants pocket and pulled out a small Tupperware container. The officer asked Celaya, "What's this?" Celaya said that he didn't know what it was and that he had found it in the trash.

At this juncture, Quigney took off Celaya's backpack and handcuffed him. This was less than a minute after the encounter first began. Referring to the object he had taken out of the pants pocket, Quigney said, "I'm going to look at that in a minute. There's something in there." The container was clear and was not very large; it was about an inch and a half around, was squared at the top, and went down at an angle.

{¶ 9} Quigney continued to search Celaya and to question him without administering *Miranda* warnings. During the questioning, Quigney asked Celaya if he had anything else on him. During this time, Celaya admitted that he had a couple of needles in his backpack.

{¶ 10} Quigney also asked about the object Celaya had been carrying (a television, which turned out not to have been stolen). State's Ex. 1 at 1:34:23 a.m. In addition, Quigney asked questions about other items in Celaya's pockets. At 1:35:40 a.m. and before looking again at the container, Quigney said, "Just to let you know, the reason you're in handcuffs is because that looks to be crystal meth * * * in the tub." *Id.*

{¶ 11} After the police finished searching Celaya, Officer Quigney placed Celaya in his police cruiser. The officers searched Celaya's backpack. They did not find any additional drugs, but they did find several syringes and some empty gel caps.

{¶ 12} Celaya was then transported to jail and charged with possession of methamphetamine and possession of drug paraphernalia.

{¶ 13} Celaya testified at the suppression hearing on his own behalf. He stated that when the police pulled up, he had been going through trash cans for scrap metal. He had been arrested many times before and had experience with how the police conduct stops. Celaya testified that, when he saw the police, he knew what was going to happen:

he was going to be asked what he was doing and then searched. In addition, Celaya said that he did not feel free to leave or run in the opposite direction because of the way the officer presented himself. He stated that the officer was asking questions, walking straight at him, and that if he turned and left, it would not end well for him. According to Celaya, he had tried that before and had been grabbed immediately. Celaya testified that he did not give the officer consent to search his jacket pocket or backpack or to search for anything other than one pocketknife. Celaya stated that the Tupperware was removed from his jacket pocket.

{¶ 14} In April 2018, the State filed an indictment charging Celaya with aggravated possession of drugs (methamphetamine), a fifth-degree felony, and possession of drug paraphernalia, a first-degree misdemeanor. Celaya subsequently filed a motion to suppress, alleging that he was detained without reasonable suspicion of criminal activity, that the police search exceeded the scope of his consent, and that any evidence and statements should be suppressed as fruit of the poisonous tree. Celaya further claimed that his statements should be suppressed under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1996).

{¶ 15} After hearing the evidence and watching the video, the trial court orally ruled that this was not a consensual encounter, that the police did not have a reasonable, articulable suspicion that criminal activity was afoot, and that the officers exceeded the scope of Celaya's consent. The trial court found that Officer Quigney had removed the Tupperware container of methamphetamine from Celaya's jacket pocket. The court filed a written judgment entry, which granted the motion to suppress for the reasons stated during the hearing.

{¶ 16} The State appeals from the trial court's ruling, raising two assignments of error.

### I. Lawfulness of the Stop

{¶ 17} In its first assignment of error, the State claims that the trial court "erred in finding that the initial contact between Celaya and the police was an unlawful investigatory detention and not a consensual encounter." The State further contends that, even if the encounter were an investigatory detention, the officers had a reasonable articulable suspicion of criminal activity to justify the stop.

{¶ 18} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 19} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001). The law recognizes three types of police-citizen interactions: 1) a consensual encounter, 2) a brief investigatory stop or detention, and 3) an arrest. *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317,

¶ 20 (2d Dist.).

{¶ 20} Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away. *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 21, citing *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Consensual encounters are not seizures, and the Fourth Amendment guarantees are not implicated in such an encounter. *State v. Taylor*, 106 Ohio App.3d 741, 747-749, 667 N.E.2d 60 (2d Dist.1995), citing *Mendenhall* at 554.

{¶ 21} Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v. Swift*, 2d Dist. Montgomery No. 27036, 2016-Ohio-8191, ¶ 10. "An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or [was] compelled to respond to questions." *Lewis* at ¶ 22, citing *Mendenhall* at 553 and *Terry* at 19. Fourth Amendment protections are implicated in an investigatory detention, i.e., a *Terry* stop.

{¶ 22} In determining whether an individual engaged in a consensual encounter or was subject to an investigatory detention, the focus is on the police officer's conduct, not the subjective state of mind of the person stopped. *State v. Ramey*, 2d Dist. Montgomery No. 26705, 2016-Ohio-607, ¶ 25. As we stated in *State v. Ward*, 2017-Ohio-1391, 89 N.E.3d 124, ¶ 26 (2d Dist.):

"A consensual encounter remains consensual even if police officers ask

questions, ask to see the person's identification, or ask to search the person's belongings, provided 'the police do not convey a message that compliance with their requests is required.' " *[State v.] Westover*, 2014-Ohio-1959, 10 N.E.3d 211, at ¶ 15 [(10th Dist.)], quoting [*Florida v.] Bostick*, [501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)].   In this regard, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' "   *Bostick* at 437, 111 S.Ct. 2382, quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

**{¶ 23}** Whether a particular police encounter with a citizen is an investigative stop, as opposed to a consensual encounter, is fact-sensitive.   *Ward* at ¶ 26; *State v. Satterwhite*, 2d Dist. Montgomery No. 15357, 1996 WL 156881, *3 (Apr. 5, 1996). "Factors that might indicate a seizure include the threatening presence of several police officers, the display of a weapon, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be required, approaching the person in a nonpublic place, and blocking the citizen's path." *State v. Cosby*, 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 13 (2d Dist.), citing *Mendenhall*.

**{¶ 24}** The trial court concluded that the encounter between Celaya and the police was not a consensual encounter.   It reasoned that the officers came upon Celaya, "had him against this garage," and Celaya had "nowhere to go.   The garages are lined up and

there are two officers right upon him." (Tr. at 36-37.) The trial court further found that the officers lacked a reasonable suspicion of criminal activity to justify the stop. On appeal, the State contends that the encounter was consensual and, even if it were an investigatory detention, the officers possessed reasonable suspicion to support the detention.

{¶ 25} In this case, we need not determine whether the stop was consensual or a *Terry* stop, because even assuming that an investigatory detention occurred, we agree with the State that the officers had reasonable suspicion of criminal activity to justify the stop.

{¶ 26} "The reasonable-suspicion standard is less demanding than the probable-cause standard used when analyzing an arrest." *State v. Hairston*, Ohio Slip Opinion No. 2019-Ohio-1622, __ N.E.3d __, ¶ 10, citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *Id.*; *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). " 'An assessment of the totality of the circumstances "does not deal with hard certainties, but with probabilities.' We consider the cumulative facts 'not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " *Id.*, quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Nevertheless, the officer must have more than an inchoate hunch or suspicion to justify an investigatory stop. *State v. Belvin*, 2d Dist. Montgomery No.

25987, 2014-Ohio-3634, ¶ 8.

**{¶ 27}** In this case, Officer Quigney saw Celaya, alone, at 1:30 a.m. in a residential neighborhood carrying a large object covered in plastic. It was cold and snowy, and Quigney observed Celaya was walking from "alley to alleyway" behind homes. When the officers drove into the alley where they encountered Celaya, Celaya was picking through trash behind a home. Viewed through the eyes of a reasonable and prudent police officer, we conclude that Celaya's behavior in that setting created a reasonable and articulable suspicion that Celaya was engaged in criminal activity, such as theft or receipt of stolen property. Accordingly, regardless of whether the encounter was consensual or investigatory, the encounter with Celaya was lawful.

**{¶ 28}** The State's first assignment of error is sustained.

### III. Did the Search of Celaya Exceed the Scope of Consent?

**{¶ 29}** The State's second assignment of error claims that "Officer Quigney did not exceed the scope of Celaya's consent to search his front right pants pocket for knives."

**{¶ 30}** Officer Quigney's search of Celaya was ostensibly based on Celaya's consent. "The scope of a search that rests on consent is limited to the extent of that consent. A person consenting can set limits on the time, duration, area and intensity of the search, as well as the conditions governing the search. An intrusion beyond those limitations would not be based on an intentional relinquishment of the right." (Citation omitted.) *State v. Howard*, 2d Dist. Montgomery No. 20321, 2004-Ohio-5287, ¶ 38. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"

(Citations omitted.) *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *State v. Boling*, 2d Dist. Montgomery No. 25310, 2013-Ohio-4813, ¶ 20.

**{¶ 31}** Officer Quigney's testimony and Celaya's testimony at the suppression hearing varied about what occurred in the alley. Officer Quigney testified that Celaya gave him permission to retrieve one or more knives from his (Celaya's) front right pants pocket. The officer did not recall if he went into other pockets, and he stated that the Tupperware was the first item he encountered in the pants pocket. Quigney indicated that he needed to pull out the Tupperware to search the bottom of the pocket. The officer stated that he then went back into the pants pocket and found a knife.

**{¶ 32}** In contrast, Celaya testified that he told the officer that he had a knife in his right pants pocket, but the officer searched his jacket first. Celaya testified that he did not give the officer consent to go through his jacket and that he did not give the officer consent to search for anything other than the pocket knife. Celaya testified that the officer retrieved the knife from his right jacket pocket.

**{¶ 33}** The cruiser video recording of the encounter differs from portions of both Officer Quigney's and Celaya's testimony. The video reflects that Officer Quigney asked Celaya if "he had anything on him" immediately after learning that Celaya was a "scrapper." The officer told Celaya that he (Quigney) knew that many scrappers carried knives. Celaya indicated that he had a couple of knives and that they were located in his right pants pocket. Celaya gave the officer consent to get the knives from that pocket. (*See* State's Exhibit 1 at 1:33.32, "Go ahead and get it out.")

**{¶ 34}** Officer Quigney initially touched the front of Celaya's pants and then reached into the front right pants pocket of Celaya's jeans. The officer pulled something

out (possibly a knife), and transferred it to his (Quigney's) left hand. The officer then patted the outside of Celaya's right jacket pocket, reached into Celaya's right jacket pocket, pulled items out, looked at them, and appeared to put them back into the jacket pocket. The officer then went back to the front right pants pocket and appeared to pull out the Tupperware container. Quigney looked at it and asked, "What's this?" Celaya responded that he did not know and that he had just found it in the trash. The officer put the container in his (Quigney's) pocket, took Celaya's backpack off of Celaya's back, and handcuffed Celaya. Quigney told Celaya that there was something in the Tupperware and that he was going to "look at it in a minute."

{¶ 35} Approximately 30 minutes after the encounter began, while Celaya was seated in a cruiser, Celaya expressed to Quigney that the officer had found the container in his jacket pocket. Celaya also indicated that he was aware that their conversation was being recorded.

{¶ 36} We have reviewed the cruiser video numerous times. The gray-scale nature of the recording, coupled with the early morning hours and the individuals' dark clothing, made it difficult to discern certain movements by the officers and Celaya. The video reflects that Officer Quigney retrieved the Tupperware containing methamphetamine from Celaya's right front pants pocket, not Celaya's jacket as found by the trial court. Nevertheless, we conclude that the officer exceeded the scope of Celaya's consent regardless of the location of the Tupperware.

{¶ 37} Officer Quigney's initial search of Celaya's pants pocket was lawful. Celaya indicated that he had a couple of knives in his front right pants pocket and gave consent for Officer Quigney to enter that pocket to retrieve the knives.

{¶ 38} However, Officer Quigney then searched Celaya's jacket pocket, removing and looking at several items before returning them to Celaya's jacket pocket. Celaya did not give the officer permission to go into his jacket, and the search of the jacket exceeded the scope of Celaya's consent to search, but nothing incriminating was found.

{¶ 39} Officer Quigney returned to Celaya's right front pants pocket, removed the Tupperware container, and asked Celaya, "What's this?" The officer handcuffed Celaya immediately thereafter. There is no indication on the video that Officer Quigney continued to search Celaya's pocket for knives after removing the Tupperware container.

{¶ 40} The trial court found that Celaya "didn't consent to having his whole person searched. He told the officers where the knife was. That's the right front pants pocket." The trial court further found that Officer Quigney did not limit his search to the right front pants pocket. Rather, the officer "went into that jacket pocket and got an item from the right jacket pocket." The trial court expressly found that the search of the jacket pocket "was beyond the scope."

{¶ 41} Based on the facts as reflected in the cruiser video, Officer Quigney's second search of Celaya's right front pants pocket exceeded the scope of Celaya's consent. Celaya's consent was limited to the officer's retrieval of a knife or knives from his right pants pocket. It appears that a knife may have been removed during the first search of the pants pocket, and there is no explanation for why the officer returned to the pants pocket after searching the jacket pocket. It appears that only the Tupperware container was removed during the second search, and there is no suggestion from the officer's actions that he believed another knife was in the pants pocket below the Tupperware. In short, the trial court did not err in concluding that the Tupperware was

discovered during a search beyond the scope of Celaya's consent. Accordingly, the trial court did not err in granting Celaya's motion to suppress.

{¶ 42} The State's second assignment of error is overruled.

### IV. Conclusion

{¶ 43} Although the officer's encounter with Celaya was lawful, his search of Celaya's person exceeded the scope of his consent. Therefore, the trial court's order granting the motion to suppress will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

WELBAUM, P.J., dissents:

{¶ 44} I agree with the majority that the officer had reasonable articulable suspicion to stop Celaya. However, unlike the majority, I believe the search was within the scope of Celaya's consent. I would reverse the trial court.

{¶ 45} This case is before us on the State's appeal from a judgment granting a motion to suppress filed by Celaya. According to the State, the trial court erred in concluding that the initial contact between Celaya and the police was not a consensual encounter, but was instead an unlawful investigative detention. In addition, the State contends that the investigating officer did not exceed the scope of Celaya's consent to search. I agree with the State for the following reasons.

{¶ 46} I agree with the majority that some of the trial court's factual determinations regarding the unlawfulness of the initial stop were not supported by

competent, credible evidence. When relying on the undisputed facts of the case and those depicted from a cruiser video, I conclude that the initial stop was a lawful, consensual encounter.

{¶ 47} Within a few seconds of the time the officer approached Celaya, Celaya admitted that he had a couple of knives on his person. He quickly consented to the officer's request to remove the knives. The interaction did not become unlawful as a result of less than a minute of time it took from the commencement of the encounter for the officer to search for the knives. Also, I disagree with the majority's conclusions that the container of drugs was seized from an area where Quigney lacked consent to search, and that the search, therefore, exceeded the scope of consent.

## I. Facts and Course of Proceedings

{¶ 48} In April 2018, the State filed an indictment charging Celaya with aggravated possession of drugs (methamphetamine) and possession of drug paraphernalia. Celaya entered a not guilty plea and filed a motion to suppress. As discussed above, his motion to suppress alleged that his statements and evidence were obtained in violation of his Fourth Amendment rights because the officer did not have a reasonable suspicion that he had committed a crime. He also contended that a police search exceeded the scope of his consent.

{¶ 49} The trial court held a suppression hearing during which the court heard testimony from Dayton Police Officer Steven Quigney and from Celaya, and also watched a video of the incident. The court then granted the motion to suppress from the bench, concluding that (1) the encounter between Celaya and the police was not a

consensual encounter; (2) that the police did not have a reasonable, articulable suspicion that criminal activity was afoot; and (3) that the officers exceeded the scope of consent for the search. The court then filed a judgment entry granting the motion for the reasons stated during the hearing.

{¶ 50} A detailed statement of the evidence presented at the suppression is included in the majority opinion. I would only add that, during cross-examination, Quigney stated that when he engages in consensual encounters on the street, he asks for consent to disarm individuals for his safety. Tr. at p. 15. Also, I disagree with the trial court's characterization that the video shows that Celaya's exit from the alley where the officers spoke with him was blocked on all sides; as discussed infra, I believe Celaya could have walked away to his left without obstruction.

## II. Was the Encounter Consensual?

{¶ 51} Under the first assignment of error, the State first contends, in passing, that Celaya failed to raise the propriety of the initial encounter, and that the trial court, therefore, improperly addressed it. The State's second point is that the police had reasonable suspicion to support an investigative detention.

{¶ 52} The defense specifically challenged the scope of consent in its motion to suppress. Also, defense counsel stated:

> * * * [I]t's our position that although he consented to have the pocket knife removed from his pants that the officer went beyond the scope of that and removed other items other than the knife that was – pocket knife that was allegedly in his pocket.

Tr. at p. 5.   Moreover, Celaya testified that he cooperated and gave consent for Quigney to search his right front pocket to retrieve a pocket knife. Tr. at p. 24-27.

**{¶ 53}** The motion to suppress filed in this case generally challenged the interaction as an unconstitutional detention, without detail. At the hearing, the defense first questioned whether the encounter was truly consensual during its closing statements.   *Id.* at p. 28. At that time, counsel stated:

> And so it started off as a consensual encounter. However, once he said do you have any weapons on you and he went into the pocket, my client testified that from his experience, he was not free to leave . . .   But yeah, starting off, there was no reasonable articulable suspicion to begin to even detain him.

Tr. at p. 29.

**{¶ 54}** The crux of this defense argument was that the consensual encounter ended when the search for the knives began, because it prohibited Celaya from leaving. The motion to suppress filed in this case was sufficient to raise the issue.

**{¶ 55}** With respect to whether the stop was consensual, the trial court found that the officers came upon Celaya and in essence, had him backed up against a garage, with a trash can and in an alley, with "two officers right upon him."   Tr. at pp. 36-37. According to the State, the trial court erred because the video indicates that Celaya could have easily walked down the alley.   State's Brief, p. 7.   However, the court also commented that "this is a situation where I think it's naïve to think that somebody would walk away.   Two officers, 1:30 in the morning.   Two cruisers right upon you."   Tr. at p. 37.

{¶ 56} I have reviewed the video, and I am required to accept only the court's factual findings that are supported by competent, credible evidence. *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8. The video illustrates that Celaya did have an available exit by walking to his left down the alley. The two officers, who were considerably larger than Celaya, partially blocked his movement to his front and right side during the search. A large trash can was mostly behind Celaya to his left. A fence and garage were also located behind him. There was an open area available for Celaya to walk away to his left, so I decline to accept this finding of fact.

{¶ 57} Within a few seconds from the beginning of the encounter and almost immediately after Quigney faced him, Celaya consented to a request to search for and remove the knives. The search for the knives and removal of the Tupperware container was concluded in less than a minute from the beginning of the encounter. From the time of the consent until removal of the Tupperware container, Celaya was actively being searched.

{¶ 58} The State also argues that Celaya's attorney admitted at the hearing that the encounter was consensual. As noted, this is correct, but only regarding the beginning of the encounter. The defense argued that the consensual nature of the encounter ended when the search began. Tr. at p. 28. The attorney prefaced those remarks by saying: "[T]here's a couple, like, levels to this. I think one is whether or not it was truly a consensual encounter. Two, I think the issue is whether or not the Tupperware container felt like a knife. And if it didn't, he [Quigney] didn't have any business inspect – pulling it or inspecting it." Tr. at p. 28.

{¶ 59} The State further argues that Celaya's subjective belief as to whether he

could leave was irrelevant. I agree, but the trial court did not base its decision on Celaya's subjective belief. Instead, the court clearly focused on what a reasonable person would believe in that situation.

**{¶ 60}** I agree with the State and the defense arguments in the trial court that the initial interaction between Officer Quigney and Celaya was a consensual encounter. The officers did not draw their guns or command Celaya to halt. The officers were cordial. Celaya had an available route to walk away if he chose to do so. I believe that a reasonable person in these circumstances would have believed that he was free to leave and not under detention. *See Lewis* at ¶ 22.

**{¶ 61}** Within a few seconds, Celaya admitted to Quigney that he possessed a couple of knives and gave consent for Quigney to remove them. The defense claims that the commencement of the search ended the consensual nature of the interaction. However, I conclude that because Celaya consented to the search, it did not terminate the consensual nature of the encounter until his backpack was removed and he was handcuffed.

**{¶ 62}** In light of this determination, I would not reach the issue of whether the officers had reasonable articulable suspicion to initiate an investigative stop.

**{¶ 63}** Accordingly, I agree with the majority in sustaining the State's first assignment of error.

### III. Did the Officer's Search Exceed the Scope of Consent?

**{¶ 64}** Under the second assignment of error, the State contends that the trial court erred in concluding that Quigney exceeded the scope of consent by searching in

Celaya's coat pocket. According to the State, even if Quigney exceeded the scope of the consent, this was of no consequence because no evidence was recovered from the coat. In addition, the State argues that even if Quigney exceeded the scope of consent by removing the Tupperware container (which Quigney admitted did not feel like a knife), his purpose in removing it was so that he could properly search the rest of Celaya's pocket for knives.

{¶ 65} Warrantless searches are per se unreasonable, but there are a few limited exceptions, including searches conducted under valid consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The ultimate test of voluntariness is whether the act was "the product of an essentially free and unconstrained choice by its maker." *Id.* at 225. "To rely on the consent exception of the warrant requirement, the state must show by 'clear and positive' evidence that the consent was 'freely and voluntarily' given." *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988), quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

{¶ 66} In *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997), the Supreme Court of Ohio held that "[v]oluntary consent, determined under the totality of the circumstances, may validate an otherwise illegal detention and search." *Id.* at 241, citing *Davis v. United States*, 328 U.S. 582, 593-594, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946). However, "[o]nce an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could

in fact leave." *Id.* at paragraph three of the syllabus. "The state has the burden to show, under the totality of the circumstances, that * * * consent to search * * * was a voluntary act of free will, as opposed to mere submission to an officer's superior position of authority, which is not sufficient to demonstrate a free and voluntary consent." *State v. Ferrante*, 196 Ohio App.3d 113, 2011-Ohio-4870, 962 N.E.2d 383, ¶ 29 (2d Dist.). *Accord State v. Prater*, 2012-Ohio-5105, 984 N.E.2d 36, ¶ 20 (2d Dist.).

{¶ 67} The trial court concluded that the officer's search had exceeded the scope of the consent given, which was to look in Celaya's right front pants pocket for knives. Initially, the court commented that Celaya "didn't consent to having his whole person searched. He told the officers where the knife was. That's the right front pants pocket. But the officer doesn't limit his search to the right front pants pocket. I don't think this officer should have been searching to begin with." Tr. at pp. 37-38.

{¶ 68} After making these remarks, the trial court stated that:

And we know that under pat-down law, you're not supposed to be searching to obtain evidence. It's just for protection. So he can only go in the pocket where the knife is. And he was directed to a specific place and the officer went beyond that. I think the tape – although there's a lot of hand movements, honestly – frankly.

And I – definitely, the officer went into that jacket pocket and got an item from the right jacket pocket. So now whether an argument can be made that Mr. Celaya moved – because his hands were moving, too – moved something from his right pants pocket up to his right jacket. I'm not sure.

But I think the burden's on the State to prove this is warrantless. They've got to prove all the exceptions to the warrant requirements here, and it's clear to me that Officer Quigney went into the jacket pocket. The right jacket pocket which is located into close proximity to the right pants pocket and found that Tupperware item that contained the suspected meth.

Court finds it was beyond the scope. They're only permitted at that point to be searching or frisking for something that will harm them. And that's the whole purpose of the pat-down law, protection of officers. This search was beyond what was necessary to protect the officers even given – assuming this was an appropriate pat-down to begin with.

Tr. at pp. 38-39.

{¶ 69} In evaluating this matter, I have reviewed the video several times. During the time that Quigney initially talked to Celaya, Quigney asked three times in rapid succession if he could get the knives. The first time no audible response was made, and the second time, Celaya stated that he was pretty sure the knives were in his right pants pocket. State's Ex. 1. The third time, Quigney asked if Celaya minded if he got the knives out. State's Ex. 1 at 1:33:17 a.m. Celaya then said "Go ahead." From this, it is clear that Celaya gave Quigney consent to obtain the knives.

{¶ 70} The trial court is correct that this all occurred very quickly. However the video shows that Quigney reached into the pants pocket and took something out. He then reached in Celaya's right front coat pocket, got something else out, looked at that item, and then put both the items into the coat pocket.

{¶ 71} Quigney then reached back into the right front pants pocket, took out an

object, and said, "What's this?" *See* State's Ex. 1 at 1:33:38-39. This object was the small container found to contain methamphetamine. It was obviously not a knife, and Quigney admitted it was not shaped like a knife.

**{¶ 72}** I agree with the majority that the trial court's conclusion that the Tupperware container was pulled from Celaya's coat pocket rather than his pants pocket is not supported by competent, credible evidence.

**{¶ 73}** Had the container been in the coat pocket, my decision would rest on what a typical, reasonable person would have understood by the exchange between the officer and the suspect. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801, 114 L.Ed.2d 297. *Accord Boling*, 2d Dist. Montgomery No. 25310, 2013-Ohio-4813, ¶ 20. Furthermore, "[t]he scope of a search is generally defined by its expressed object." *Jimeno* at 251; *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168 at ¶ 99, citing *Jimeno*, at 251.

**{¶ 74}** I disagree with the majority that the search exceeded the scope of the consent. The video indicates that Celaya clearly gave Quigney permission to search for "a couple" of knives. Celaya did not say the knives were in his pants pocket. Rather, Celaya expressed to Quigney that he thought the knives were possibly in his right front pocket. Therefore, it would be reasonable for Quigney to search at multiple locations until the knives were found. Quigney could lawfully continue the search after the first knife was found because Celaya told Quigney he had more than one knife.

{¶ 75} Because Quigney was reaching into the right front pocket, a place where he had consent to search (and had not yet found a knife), the issue then would be whether the presence of suspected methamphetamine in the container was in plain view.

{¶ 76} The Defense alluded to the plain view doctrine during its closing remarks at the hearing.  Tr. at p. 28. In this regard, Quigney testified that he removed the container to facilitate his search for the knife at the bottom of the pocket. Tr. at p. 19. Quigney did not immediately open the container; he simply looked at it quickly and set it aside in his pocket to keep his hands free while he removed Celaya's back pack. Tr. at pp. 10, 17. Quigney testified that when he first looked at the contents within the clear container, he believed it to be crystal methamphetamine, which he had experience identifying. He testified that at some point he asked Celaya if it was crystal meth, and Celaya answered that it was salt. Tr. at pp. 11, 12.

{¶ 77}  Because the trial court concluded that the search exceeded the scope of consent, it did not consider the potential application of the "plain view" doctrine.  In *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the Supreme Court noted:

> It is well established that under certain circumstances the police may seize evidence in plain view without a warrant.  But it is important to keep in mind that, in the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure.  The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal

concomitant of any search, legal or illegal.

An example of the applicability of the "plain view" doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character. * * * Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. * * * Thus the police may inadvertently come across evidence while in "hot pursuit" of a fleeing suspect. * * * And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant. * * * Finally, the "plain view" doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object.

(Citations omitted.)  *Coolidge* at 465-466.

{¶ 78} In order to apply this doctrine, several conditions must be satisfied. These include: "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; the item must be in plain view and "its incriminating nature must be 'immediately apparent' "; and "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."  *Horton v. California*, 496 U.S. 128, 136-37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990).

{¶ 79} Accordingly, I would also sustain State's second assignment of error and

remand the case to the trial court to consider whether the plain view doctrine applied to allow seizure of the drugs in the container.

{¶ 80} For these reasons, I very respectfully dissent.

Copies sent to:

Mathias H. Heck
Andrew T. French
Lucas W. Wilder
Hon. Timothy N. O'Connell